**IN THE UNITED STATE COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **JOHN DOE** | § | |
|     **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:21-cv-1356** |
| | § | |
| **THE UNIVERSITY OF TEXAS MD** | § | |
| **ANDERSON CANCER CENTER; THE** | § | |
| **UNIVERSITY OF TEXAS HEALTH** | § | **JURY DEMANDED** |
| **SCIENCE CENTER AT HOUSTON, et al.** | § | |
|     **Defendants.** | § | |

---

**PLAINTIFF'S RESPONSE TO**
**INSTITUTIONAL DEFENDANTS' MOTION TO DISMISS [Dkt. 30]**

---

Plaintiff **JOHN DOE** ("John" or "Doe") submits this Response to Institutional Defendants' Motion to Dismiss [Dkt. 30] filed by Defendants **THE UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER** ("MDA"), and **THE UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER AT HOUSTON** ("UTH"), and provides as follows:

### SUMMARY OF THE ARGUMENT

Defendants waived sovereign immunity of Plaintiff's TCHRA claim by voluntarily removing this case from State court and choosing to submit to federal jurisdiction. Plaintiff timely filed and properly states claims for relief of national origin, sex, and disability discrimination and retaliation based on theories of disparate treatment and continuing violation. Defendants treated a similarly situated co-worker and co-student more favorably than Plaintiff in violation of Title VII, TCHRA and Title IX.  Doe states plausible claims

1

for relief pursuant to Federal Rule of Civil Procedure 12(b)(6) and under the Takings

Clause of the Texas Constitution, Art. I, § 17.

## TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT………………………………………………1

TABLE OF CONTENTS……………………………………………………......2

NATURE AND STAGE OF PROCEEDINGS……………………………………3

ISSUES AND STANDARD OF REVIEW……………………………………….4

ARGUMENT AND AUTHORITIES……………………………………………...5

A.     DOE'S TCHRA CLAIMS ARE NOT BARRED BY SOVEREIGN
     IMMUNITY……………………………………………………………5

B.     DOE PROPERLY STATES CLAIMS FOR RELIEF UNDER TITLE VII…...7

1.    DOE TIMELY FILED HIS CHARGE AND EXHAUSTED
    ADMINISTRATIVE REMEDIES UNDER BOTH DISPARATE
    TREATMENT AND CONTINUING VIOLATION THEORIES………..…….8

    Doe Timely Filed His Charge of Disparate Treatment Discrimination……………8

    Continuing Violation Theory Applies to Render Employment Actions Timely…..10

2.    MDA SUBJECTED DOE TO ADVERSE EMPLOYMENT ACTIONS AND
    TREATED OTHERS SIMILARLY SITUATED MORE FAVORABLY…..12

    Adverse Employment Actions under a Theory of Disparate Treatment………….13

    Adverse Employment Actions under a Theory of Continuing Violation…………13

    Comparative Group Consists of MDA Employees Accused of Violation of the MDA
       Sexual Misconduct Policy…………………………………………....15

    Similarly-Situated Treated More Favorably Under Disparate Treatment and
       Continuing Violation Analyses……………….……………….……….....16

    **3.**   **PLAINTIFF STATES A VIABLE TITLE VII/TCHRA RETALIATION CLAIM**……………………………………………………………………..……………**18**

        Doe Engaged in Protected Activity………………………………………………...19

        Materially Adverse Actions in Retaliation Cases, Not Ultimate Employment Acts……………………………………………………..…………………20

        Causal Connection-Direct Evidence of Retaliatory Animus……………………..21

        Causal Connection-Circumstantial Evidence with Temporal Proximity………...22

**C.**     **PLAINTIFF PROPERLY STATES A TITLE IX CASE**……………………..**24**

    1.  Plaintiff States a Title IX Erroneous Outcome Claim……………………………25

        Facts Sufficient to Cast Articulable Doubt on the Accuracy of the Outcome…….26

        A Particularized Causal Connection Between the Flawed Outcome and Gender Bias……………………………..……………………………………27

    2.  Plaintiff States a Title IX Selective Enforcement Claim…………………………29

**D.**     **PLAINTIFF STATES A TAKINGS CLAIM UNDER THE TEXAS CONSTITUTION**……………………………………………………..……………**33**

**CONCLUSION**……………………………………………………………………**37**

**CERTIFICATE OF SERVICE**……………………………………………………...**38**

## NATURE AND STAGE OF PROCEEDINGS

John Doe was falsely accused of sexual harassment by a female co-worker and co-student, Li Cai ("Cai"), in response to which MDA and UTH engaged in discriminatory and constitutionally impaired actions that resulted in John's unwarranted suspension over a two-year period with significant damage to his career and reputation despite no finding of guilt on any charge.  On the contrary, the findings were largely favorable to Doe.

Defendants persisted in their continuing violation of Doe's civil rights under Title VII[1] and the TCHRA[2] based on sex (male), national origin (USA/Taiwanese), disability (perceived emotional disability) and/or retaliation, and in violation of Title IX[3] and the Takings Clause of the Texas Constitution[4].  John filed suit in Harris County, Texas on February 28, 2021 after which Defendants removed the case to federal court on April 23, 2021. Plaintiff filed his second amended complaint on November 12, 2021.

## ISSUES AND STANDARD OF REVIEW

MDA moves to dismiss under Fed. R. Civ. P. 12(b)(1) (sovereign immunity jurisdiction) and Defendants move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) (dismissal for failure to state  a claim upon which relief can be granted).  The issues presented are whether MDA is entitled to sovereign immunity for the TCHRA claims, and whether Plaintiff has stated claims for relief under Title VII, the TCHRA, Title IX and the Takings Clause of the Texas Constitution.

In a motion for dismissal on the pleadings, the plaintiff's well-pleaded factual allegations are accepted as true and all reasonable factual inferences are drawn in its favor. *Albright v. Oliver*, 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (on motion to dismiss on the pleadings, disputed material facts are viewed in the light most favorable to the complainant). A Rule 8(a) complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

---

[1] Title VII, 42 U.S.C. δ 2000A, 2000e *et seq*. [Dkt. 13, ¶ 106-114].
[2] Texas Commission on Human Rights Act, Texas Labor Code 21.001 *et seq*. [Dkt. 13, ¶ 106-114].
[3] Title IX of the Educational Amendments of 1972, 20 USC §1681, *et seq*. [Dkt. 13, ¶145-154].
[4] Violation of Takings Clause, Texas Constitution, Art. 1, δ 17. [Dkt. 13, ¶ 155-56].

4

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955 ). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955 ). "[A] complaint should not be dismissed [under Rule 12(b)(6)] for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief". *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Plaintiff has sufficiently pled his claims.

## ARGUMENT AND AUTHORITIES

### A.   DOE'S TCHRA CLAIMS ARE NOT BARRED BY SOVEREIGN IMMUNITY

Defendants assert that MDA and UTH are state governmental entities and as such enjoy the same sovereign immunity as the State of Texas, citing Texas Gov't Code § 441.101(3). Section 441.101(3), however, is a wholly irrelevant statute addressing Texas Libraries and Archives and the maintenance and distribution of State publications. In addition to the fact that Defendants fail to cite relevant statutory law directly on point regarding sovereign immunity, and although there are a number of provisions in the TCHRA reflecting consent to suit, Defendants argument fails because Defendants voluntarily consented to federal court jurisdiction when they removed the case from state court. *Jackson v. Tex. S. Univ.*, 997 F.Supp.2d 613, 624 (S.D. Tex. 2014), citing *Perez v. Region 20 Educ. Service Center*, 307 F.3d 318, 332–22 (5th Cir.2002).

5

Defendants rely on *Tegic Comm's Corp. v. Bd. of Regents of Univ. of Texas Sys.*, 458 F.3d 1335 (Fed. Cir. 2006) to bolster their argument that Defendants are entitled to sovereign immunity from suit under the TCHRA but fail to apprize this court of the *Tegic* court's acknowledgment that sovereign immunity is waived when the State entity voluntarily submits to federal jurisdiction, as Defendants did in this case:

> The Court "has long recognized" that a state's Eleventh Amendment immunity may be waived. *College Savings Bank*, 527 U.S. at 675, 119 S.Ct. 2219. Waiver is generally found either when the state makes a "clear declaration" that it intends to waive immunity, such as by statute, . . . , ***or when the state voluntarily invokes federal jurisdiction***, see *Gunter v. Atlantic Coast Line R.R. Co., 200 U.S. 273, 26 S.Ct. 252, 50 L.Ed. 477 (1906)* (immunity waived by voluntarily becoming a party to a suit).

*Tegic*, 458 F.3d at 1340 (emphasis added).

The Fifth Circuit adopts this reasoning as well. *Meyers ex rel Benzing v. Texas*, 454 F.3d 503, 504 (5th Cir. 2006)(by removing this case, Defendants waived its right to object to federal jurisdiction based on state sovereign immunity). Thus, "[w]here a State voluntarily becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment." *Tegic*, 458 F.3d 1340-41, citing *Gunter v. Atlantic Coast Line R.R. Co.*, 200 U.S. 273, 292, 26 S.Ct. 252, 50 L.Ed. 477 (1906); *Gardner v. New Jersey*, 329 U.S. 565, 574, 67 S.Ct. 467, 472, 91 L.Ed. 504 (1947)(the State waives any immunity respecting the adjudication of a claim voluntarily filed in federal court); *Clark v. Barnard*, 108 U.S. 436, 447, 2 S.Ct. 878, 27 L.Ed. 780 (1883) (immunity from suit is a "privilege" that is waived when a state voluntarily submits to the jurisdiction of a federal court). As the *Tegic* court observed in relying on the Supreme

6

Court's opinion in *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002), State entities cannot have it both ways, voluntarily invoking federal jurisdiction and then denying it in the same case:

> . . . the State of Georgia was brought involuntarily into a case filed in state court, but then voluntarily agreed to removal to federal court. In doing so, it voluntarily invoked the federal court's jurisdiction and could not thereafter seek dismissal by invoking Eleventh Amendment immunity. *Id*. at 620, 122 S.Ct. 1640. The Court explained that it would be "anomalous or inconsistent" for a state to both "invoke" and "deny" immunity in the same case. *Id.* at 619, 122 S.Ct. 1640.

*Tegic,* 458 F.3d at 1340-41.

Defendants cite no statutory or case law supporting its inference that since the TCHRA claim was added to the amended complaint after Defendants voluntarily invoked federal jurisdiction, it should not be held to its voluntary submission to federal jurisdiction. Hence, MDA has waived its right to claim immunity to suit under the TCHRA based on sex, national origin, and disability discrimination and retaliation by voluntarily submitting itself to federal jurisdiction. Otherwise, if Defendants wish to benefit from sovereign immunity, they should agree to remand back to the State court.

## B.    DOE PROPERLY STATES CLAIMS FOR RELIEF UNDER TITLE VII

Contrary to MDA's misplaced argument that Doe's disability claim must be dismissed because there is no disability claim under Title VII, Plaintiff asserts his disability claim under the TCHRA, Texas Labor Code 21.001, *et seq*., 21.105, not Title VII, and the

7

Americans with Disabilities Act[5] ('ADA'), 42 U.S.C. §§ 12101, 12131-12134, *et seq*. [Dkt. 13, ¶ 74, 107].

1. **DOE TIMELY FILED HIS CHARGE AND EXHAUSTED ADMINISTRATIVE REMEDIES UNDER BOTH DISPARATE TREATMENT AND CONTINUING VIOLATION THEORIES**

***Doe Timely Filed His Charge of Disparate Treatment Discrimination***

On or about August 10, 2020, and ***within the 300-day deadline*** to file a charge of disparate treatment against MDA (as conceded by Defendants who rely on August 7, 2020 and thereafter for Doe to be within the 300-day EEOC/TCHRA deadline), MDA advised Doe that he would not be permitted to resume his employment at the prestigious DePinho research laboratory (after Doe did not agree to a harsh and discriminatory Management Plan [Dkt. 13, ¶¶ 26-32, 67-69, 92, 94]) despite MDA finding no credibility to the co-worker's sexual harassment allegations or any finding of responsibility relating to a violation of Code of Conduct Principle 9 before the SEPC (Student Evaluation & Promotions Committee) (Dkt. 13, ¶ 21, 73, 111, fn. 45; 13.1, Exb. 18a, p. 2, 4). Instead, because Doe opposed the disparate and discriminatory treatment under the Management Plan and would not agree to its terms, MDA transferred Doe away from the highly esteemed and prominent DePinho Lab, and demoted and reassigned him to a different laboratory with different opportunities, harming Plaintiff's career.  [Dkt. 13, ¶¶ 26-32, 67-69, 92, 94].  Defendant's Management Plan would have isolated Doe from his peers and

---

[5] Doe asserts his claim for disability discrimination under TCHRA and the Americans with Disabilities Act [Dkt. 13, ¶ 74], however neglected to re-assert his reference to the ADA in the discrimination claim section, subsuming it within the Title VII section. [Dkt. 13, ¶ 107]. This can be readily rectified by a brief amendment.

changed the essence of his workplace compared to his co-workers. [Dkt. 13, ¶¶ 67-69, 92, 94, 111-12; Dkt. 13.1, ¶ 7, 18a, p. 5].  In addition, Doe could not resume his previous research because he also learned upon resuming work in September, 2020 (also within the 300-day timeline) that MDA had destroyed all of his HHMI fellowship research previously conducted at the DePinho Lab. [Dkt. 13, ¶¶ 40, 92-94].

A transfer or reassignment can be the equivalent of a demotion, and thus constitute an adverse employment action. *Thompson v. City of Waco,* 764 F.3d 500, 503 (5th Cir. 2014), citing *Alvarado v. Tex. Rangers*, 492 F.3d 605, 612 (5th Cir.2007)("[T]o be the equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Id*. at 613 (quoting *Sharp v. City of Hous.*, 164 F.3d 923, 933 (5th Cir.1999)).

Thus, MDA engaged in adverse employment actions against Plaintiff in violation of Title VII and the TCHRA on August 10, 2020 and thereafter by refusing to reinstate Plaintiff to his original prestigious laboratory position unless he agreed to a discriminatory Management Plan.  MDA's actions including his demotion and reassignment to less prestigious and rewarding research and career opportunities, and destroying his DePinho research, all occurred within the 300-day deadline for filing a charge of discrimination. Accordingly, Plaintiff properly exhausted his administrative remedies and timely filed his charge of discrimination.

***Continuing Violation Theory Also Applies to Render Employment Actions Timely***

Title VII also makes it unlawful for employers to require "people to work in a discriminatorily hostile or abusive environment." *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 432 (5th Cir. 2022), citing *Gardner v. CLC of Pascagoula, L.L.*C. , 915 F.3d 320, 325 (5th Cir. 2019) (quoting *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' " *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 106, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1) ). MDA engaged in violations of Title VII and TCHRA based on a theory of continuing violations consistent with creating a hostile work environment.[6]  [Dkt. 13, ¶¶ 63, 65, 76-79, 82, 87-88-90, 107-08, 111-12; Dkt. 13.1, Exb. 18a, p. 1]. The Fifth Circuit in *Heath v. Bd. of Supervisors for the S. Univ. & Agric. And Mech. College,* 850 F.3d 731 (5th Cir. 2017) considered the Supreme Court's continuing violation-timeliness analysis in *Morgan*, *supra* and clarified that timeliness inquiry:

> That doctrine provides that when a plaintiff alleges a hostile work environment claim, "as long as an employee file her complaint ***while at least one act which comprises the hostile work environment claim is still timely***, '***the entire time period of the hostile work environment may be considered by a court for the purpose of determining liability.***' " *Hartz v. Adm'rs of Tulane Educ. Fund*, 275 Fed. Appx. 281, 289 (5th Cir. 2008) (quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

---

[6] Plaintiff did not use the specific terminology "hostile work environment" in his Complaint but repeatedly asserted his allegations involved a continuing violation [Dkt. 13.1, ¶ 18a, p. 1], continuing actions, a continuing pattern and practice of actions, and similar terminology consistent with alleging continuing violations aka a hostile work environment claim. Dkt. 13, ¶¶ 107-08, 111-12. Using the term hostile work environment is not required to state a claim for relief and, if it is, can be easily remedied with an amendment.

A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' *Morgan,* 536 U.S. at 106. The Fifth Circuit explains further, "[h]ostile environment claims are ***continuing*** because they involve repeated conduct, so the ***unlawful employment practice*** cannot be said to occur on any particular day. . ." As long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Heath,* 850 F.3d at 737. Defendant created an ongoing hostile environment through its decision to humiliate and ridicule Doe by immediately suspending him as if he posed a threat to others in November, 2018; continuing his suspension day after day even after the criminal sexual harassment and stalking allegations were dismissed and after no adverse findings were made against him in the administrative proceeding based on the false claims; and then on or about August 10, 2020 (and within the 300-day EEOC deadline) demote and/or reassign him away from the prominent DePinho Lab and subject him to significantly different responsibilities involving severely restricted work conditions or otherwise accept a harsh and punitive Management Plan which would have continued to this day. [Dkt. 13, ¶¶ 24-105, 106-112Dkt. 13.1, Exb. 18a].  Doe describes in detail in his second amended complaint over forty (40) actions taken against him by MDA in furtherance of its continuing violation of his rights under Title VII and TCHRA consistent with the continuing violation theory of recovery [Dkt. 13, ¶ 107-114].

Plaintiff filed his charge of discrimination while at least one act comprising the continuing violation claim was still timely—that is, his demotion and/or reassignment from

the DePinho Lab  or about August 10, 2020, or alternatively accepting and continuing employment under the imposition of the harsh Management Plan that would continue to this day.  Therefore, ***the entire period of the hostile environment*** beginning in November, 2018, and including his continuing suspension (November 2018 to September 2020) and his transfer or placement under a punitive Management Plan (September 2020), is timely under Title VII and the TCHRA. *Heath, supra.*

## 2.  MDA SUBJECTED DOE TO ADVERSE EMPLOYMENT ACTIONS AND TREATED OTHERS SIMILARLY SITUATED MORE FAVORABLY

"A claim will not be dismissed unless the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Scott v. U.S. Bank Nat'l Ass'n,* 16 F.4th 1204, 1209 (5th Cir. 2021), citing *Alexander v. Verizon Wireless Servs., L.L.C.* , 875 F.3d 243, 249 (5th Cir. 2017); *Anderson v. Valdez,* 845 F.3d 580, 589 (5th Cir. 2016), quoting *Ashcroft v. Iqbal* , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When we consider the McDonnell Douglas factors to assist for purposes of reference in this analysis, the elements of disparate treatment discrimination are that the plaintiff: (1) is a member of a protected class; (2) was qualified for his position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in a case of alleged disparate treatment, he must show that others similarly situated were treated more favorably. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Defendants concede elements one and two, that Doe is a member of a protected class (male, USA/Taiwanese, perceived as disabled) and was qualified for his position, but challenge whether Plaintiff has pled sufficient facts to show plausible claims of sex, national origin

12

and disability discrimination. Plaintiff, however, alleges abundant facts supporting his stated claims.

### Adverse Employment Actions under a Theory of Disparate Treatment

MDA subjected Doe, a USA/Taiwanese male, perceived as mentally/psychologically disabled [Dkt 31, ¶ 110-112] to adverse employment actions consisting of (1) demoting and/or reassigning Plaintiff out of the esteemed DePinho Laboratory; (2) requiring him to undergo therapy despite no basis for such a demand and even after having failed to find Doe violated any rule or principle of employee conduct, and/or (3) subjecting him to the harsh and humiliating Management Plan isolating him from his peers and colleagues even after the criminal sexual harassment and stalking allegations were dismissed as unsubstantiated and the SEPC  was unable to arrive at a decision regarding Doe's guilt to a possible violation of Principle 9, and finding no issues regarding his mental fitness. [Dkt. 13, ¶67-69, 74, 83-84, 92-96, 111-12]. The similarly situated employee, Cai (a female, Chinese National, not disabled) co-worker, was not subjected to *any* of the aforementioned adverse employment actions despite her also being the subject of the filing of a violation of the MDA Sexual Misconduct policy and engaging in unprofessional communications in violation of Principle 9.  [Dkt. 13, ¶ 20-21, 23, 28, 30-31, 33-34, 45, fn. 15 and 16, 46, 65, 67, 69-74, 84, 192-93].

### Adverse Employment Actions under a Theory of Continuing Violation

In order for harassment to affect a term, condition, or privilege of employment, as required to support a continuing violation claim under Title VII, it must be "`sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

13

working environment.'" *Ramsey v. Henderson*, 286 F.3d 264 (5th Cir. 2002), citing *Harris,* 510 U.S. at 21. MDA subjected Doe to a significant change in his employment status, including but not limited to, immediate suspension, continued suspension for over two years (with hugely significant negative professional ramifications) without any finding of responsibility for misconduct and nothing to support the credibility of the accusations, and reassignment with significantly different responsibilities and opportunities to Doe. [Dkt. 13, ¶20-21, 23, 28, 30-34, 45-46, 92-112].

The continuing violations by MDA to which the similarly situated employee Cai was not subjected include, but are not limited to:  (a) continually treating Doe as if he had engaged in serious criminal acts rather than having engaged in benign, sarcastic electronic mail communications with a female associate while both were outside of work, (b) removing him from his place of work for nearly two years, and his continued removal from his laboratory even as of the date of this response despite no findings of guilt, (c) performing a secret psychological risk assessment on him without the benefit of a fair, sufficient opportunity for Plaintiff's input and assessment by qualified personnel and denying him the opportunity to contest the assessment, thus perceiving him as mentally disabled in some manner, leading to his immediate suspension; (d) communicating with campus police in conveying the female Chinese associate's false allegations of sex-related harassment and stalking, leading to Doe's false arrest, but engaging in no similar communication with police regarding Doe's accusations against Cai that her accusations were fabricated; (e) requiring Doe to undergo an unwarranted psychiatric assessment and testing at his own expense followed by on-going therapy because of the perception of him

14

as mentally disabled while no such similar protocols were required of Cai whose allegations were repeatedly found to be uncorroborated or conflicted with objective witnesses and whose communications were unprofessional and lacking in mutual respect, (f) imposing a harsh Management Plan against Doe even though there were no findings to warrant such conditions of employment, and imposing no similar Plan on Cai whose allegations were unsubstantiated or outright contradicted, as well as many other disparities outlined in Plaintiff's complaint. *Id.* [Dkt. 13, ¶¶ fn. 45, 85-93, 106-114; Dkt. 13.1, ***Exbs.*** 1a, 2b, 3a-3b, 5b, 9, 10 and 18a].

***Comparative Group Consists of MDA Employees Accused of Violation of the MDA Sexual Misconduct Policy***

MDA treated Cai, a similarly situated MDA co-worker who was also accused of violations of MDA's sexual misconduct policy, more favorably compared to Doe. The MDA policy on which Cai relied in filing a sexual harassment complaint against Doe provides:

> **Sexual Harassment:** Sexual Harassment includes:
> Unwelcome conduct of a sexual nature including but not limited to unwelcome sexual advances, requests for sexual favors, and/or other verbal or physical conduct of a sexual nature when: Submission to such conduct is made either explicitly or implicitly as a term or condition of an individual's employment or appointment or for participation in any other academic or employment-related activity;

> **Stalking:** Engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for the person's safety or the safety of others or suffer substantial emotional distress.

Dkt. 13.1, Exb. 2b, pp. 6, 7.

MDA embraced Cai's all-purpose accusation that Doe had sexually harassed and stalked her, and proceeded to put Plaintiff through what can only be described as a hellish experience, in which none of Cai's allegations of sexual harassment or stalking could be substantiated. [Dkt. 13, ¶¶ 85, 106-114; Dkt. 13.1, Exb. 2b, 5b]. In comparison, when Doe sought to rely on that same policy with his reports of Cai's stalking and filing a false complaint, MDA spurned his reports:

### 9.0 Other Conduct Violations

> **False Complaints**. Any person who knowingly files a false complaint under this policy is subject to disciplinary action up to and including dismissal or separation from the institution. A finding that a Respondent is not responsible for the Sexual Misconduct alleged does not imply a report was false.

Dkt. 13.1, Exb. 2b, Other Conduct Violations, Sections 9.0, 9.2, Exb. 14, Exb. 15a; Dkt. 85.

Accordingly, Cai and Doe are both similarly situated employees in the comparison group that are co-workers in the same lab; both research students; but were treated remarkably differently in terms of MDA's acceptance of the charge, investigation, findings and disciplinary action, and in a manner significantly more favorable to Cai compared to Doe. This comparison is sufficient to state a claim. Because employee and student investigations are confidential, Plaintiff anticipates additional comparators will arise during discovery.

### *Similarly-Situated Treated More Favorably Under Disparate Treatment and Continuing Violation Analyses*

The distinction in Defendants' treatment of Cai compared to Doe differs so radically as to be shocking, and clearly reflects that Cai (female/Chinese National/Not Disabled) was intentionally treated more favorably than Doe (male/USA-Taiwanese/Perceived as

Disabled) with the only substantive difference between the two being their national origin, sex, and perceived disability status. Despite also being accused of stalking as well as filing a false sexual harassment report, both violations of MDA's sexual misconduct policy, **Cai did not experience ANY** of the infringements on her rights that Doe did despite both being accused under the same MDA sexual misconduct policy, including but not limited to: (1) Cai was not immediately suspended without investigation for allegations of stalking, rather the initial response by MDA was not even to open an investigation until pressed to do so; (2) Cai was not removed from the DePinho Lab at any time despite her false allegations and failing performance compared to Doe's stellar achievements; (3) Cai was not subjected to an extended and hostile investigation involving interrogation sessions, questioning of peers and colleagues, and an executive summary of findings, as Doe was; (4) Cai was not presumed guilty but innocent, while Doe was presumed guilty and still is perceived to be; (5) Cai was not referred for any review for her false allegations, unprofessional conduct and unprofessional comments under Principle 9, Doe was; (5) Cai was not forced to undergo a psychiatric assessment or on-going psychiatric therapy, particularly given the total lack of substantiation to her incredibly inflammatory allegations, and in some cases, with direct evidence conflicting with her accounts, and also considering her unprofessional communications with Doe, Doe was; (6) Cai was not subjected to non-renewal of her contract, Doe was; (7) Cai was not demoted and/or reassigned and forced to leave the DePinho Lab and transfer to another lab, Doe was; (8) Cai was not placed under a Management Plan for her demand that Doe never greet or speak to her, Doe was, despite his communications reflecting his unsuccessful attempt to resolve the communication

17

problems he and Cai were having.  [Dkt. 13, ¶¶ 85-93, 106-114, Dkt. 13.1, Exb. 5b, 9; *See also*, Section 3, *infra*].  Plaintiff alleges plausible Title VII/TCHRA claims sufficient to create the reasonable inference that MDA was motivated by Plaintiff's sex, national origin and/or perceived disability status when taking its adverse employment actions against Doe.

## 3.    PLAINTIFF STATES A VIABLE TITLE VII/TCHRA RETALIATION CLAIM

Plaintiff alleges facts sufficient to create the reasonable inference that MDA took adverse employment actions against Plaintiff that were motivated by an intent to retaliate for protected activities[7]. Although Plaintiff is not required to establish a *prima facie* case of retaliation at this stage in the proceedings, we can look to the elements of a retaliation claim for reference purposes.

A Title VII retaliation plaintiff must show that (1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action. *Fisher v. Lufkin Indus., Inc.,* 847 F.3d 752, 757 (5th Cir. 2017), citing *Zamora v. City of Hous.*, 798 F.3d 326, 331 (5th Cir. 2015); *McCoy v. City of Shreveport*, 492 F.3d 551, 557-58 (5th Cir. 2007).

---

[7] Title VII "prohibits an employer from 'discriminat[ing] against' an employee … because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. § 2000e-3(a)).

*Doe Engaged in Protected Activity*

Contrary to Defendant's assertion that Plaintiff engaged in only one protected activity, John's participating in the Title VII investigation into Cai's allegations is protected activity. *See Evans v. City of Houston*, 246 F.3d 344, 352-53 (5th Cir. 2001). John also repeatedly requested that MDA institutional policies be applied in a non-discriminatory fashion, [Dkt. 13, ¶ 61, 107].   In addition, he presented three separate complaints of protected activity:

(1) On November 26, 2019, Doe filed complaints with MDA and UTH Institutional Compliance presenting allegations of policy violations by individuals handling the sexual harassment complaint against him and the investigations that followed. [Dkt. 13, ¶ 75, 13a, Exb. 12];

(2) On December 2, 2019, John filed additional complaints with MDA and UTH Institutional Compliance alleging violations by accuser Cai for making a false complaint of sexual harassment and stalking. [Dkt. 13, ¶ 75; 13.1, Exb. 14];

(3) On June 3, 2021, John filed a charge of discrimination with the EEOC and the TCHRA alleging discrimination based on sex (male), national origin (USA/Taiwanese), disability(perceived mental impairment) and retaliation. [Dkt. 13.1, Exb. 18a].

Plaintiff asserts that the retaliation he experienced formed the same continuous violation following his verbal and written reports of discriminatory treatment such that acts that occurred prior to and following the official reports are likewise part of a continuing violation of his right to be free from retaliation. *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 291 (5th Cir. 2019)[8].

---

[8] The Fifth Circuit acknowledged Frye's argument that the retaliatory acts formed a continuing violation of her rights for retaliation purposes *occurring both before and after the actual report* as argued in this case, but found Frye had waived that argument on appeal by failing to raise it in the district court. *Frye, supra.* Doe does raise that argument in this court.

**Materially Adverse Actions in Retaliation Cases, Not Ultimate Employment Acts**

Plaintiff asserts direct and circumstantial evidence of retaliation against him after he engaged in protected activity. [Dkt. 13, ¶ 75-76; 13.1, Exb. 12-14]. The Fifth Circuit's *McCoy* decision recognized the Supreme Court's decision in *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) embracing a different definition of adverse employment actions in retaliation cases as a ***materially adverse action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination.*** " *Lindsley v. TRT Holdings, Inc*., 984 F.3d 460 (5th Cir. 2021)(emphasis added), citing *Burlington, supra.* The Supreme Court stressed that ***context matters***, meaning what is inconsequential for most employees may matter enormously to another employee. *Burlington Northern*, 548 U. S. at 69. If the plaintiff establishes a prima facie case, then the burden shifts to the defendant to demonstrate a legitimate, non-retaliatory reason for the employment action. At no point does MDA make any attempt to argue or demonstrate legitimate, non-retaliatory reasons for its employment actions against Plaintiff. *Gorman v. Verizon Wireless Tex., L.L.C.* , 753 F.3d 165, 170, 171 (5th Cir. 2014).

Therefore, we are not looking for ultimate employment decisions as in Title VII claims but rather for materially adverse actions that affect employment or alter the conditions of the workplace viewed in the retaliation context.[9] *Id.* Oddly enough, after acknowledging the Supreme Court recognizes this wholly different analysis in retaliation

---

[9] The substantive law governing Title VII and [Texas Labor Code] retaliation claims is identical.  *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460 (5th Cir. 2021), citing "*Gorman v. Verizon Wireless Tex., L.L.C.* , 753 F.3d 165, 170 (5th Cir. 2014).

claims, Defendants then proceed to rely on a series of cases involving adverse employment actions which do not apply to the Supreme Court's *Burlington* analysis or to the facts of this case. Defendants first rely on *Breaux v. City of Garland*, 205 F.3d 150, 157, 158 (5th Cir.), *cert. denied*, 531 U.S. 816 (2000), a first amendment retaliation case decided prior to *Burlington,* followed by referencing *Stewart v. Mississippi Transp. Com'n*, 586 F.3d 321, 331-32 (5th Cir, 2009), relied on by *Brooks*, in which a Plaintiff is reinstated after a three-week suspension with pay. That scenario is hardly comparable to Doe who was suspended for **<u>nearly two years</u>**, had his work destroyed, and then subjected to a lab transfer. Defendant also relies on *Brown v. City of Syracuse,* 673 F.3d 141, 144 (2d Cir. 2012) (a second circuit case not alleging retaliation) and *Peltier v. United States,* 388 F.3d 984, 988 (6th Cir. 2004) (a pre-*Burlingham* sixth circuit case), neither of which assists in our analysis.

### *Causal Connection-Direct Evidence of Retaliatory Animus*

MDA retained attorney Darren Gibson, who had a long history of perpetuating gender-biases at institutions like MDA and UTHealth, and who consistently and systematically "rubber stamped" the institution's conduct by ensuring that investigative findings were favorable to the institution paying him and his firm to investigate Doe. [Dkt. 13, ¶ 76, 77]. Gibson acted like "judge, jury and executioner" when it came to MDA's investigation of Plaintiff's complaints, making biased decisions unfavorable to Plaintiff about what and who would and would not be investigated. *Id.* Gibson questioned Plaintiff in an overtly hostile manner, interrupting him repeatedly and trying to stop him from presenting his position fully. [Dkt. 13 ¶ 76, 82, 87-90]. Gibson ridiculed Doe and made

21

implicit as well as explicit threats against Plaintiff, using other MDA anti-retaliation policies as leverage in an attempt to get Doe to "back off" of certain of his complaints. [Dkt. 13, ¶ 63, 65, 76-79, 82, 87-90]. It is clear that Defendants were furious about Plaintiff's complaints and intended to use every means possible to retaliate against him, thus evidencing ***direct evidence of retaliatory animus***. [Dkt. 13 ¶ 79, 82].

***Causal Connection-Circumstantial Evidence with Temporal Proximity***

"Close timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a prima facie case of retaliation." *Mooney v. Lafayette Cnty. Sch. Dist*., 538 Fed.Appx. 447, 454 (5th Cir.2013). The Fifth Circuit has found "for example, that a time lapse of up to four months may be sufficiently close, while a five-month lapse is not close enough without other evidence of retaliation." *Id*., citing *Brooks v. Hous. Indep. Sch. Dist*., 86 F.Supp.3d 577 (S.D. Tex. 2015). Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Id.* (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997))."   A lapse "of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Id.* (citing *Weeks v. NationsBank, N.A*., CIV.A. 3:98-CV-1352M, 2000 WL 341257 (N.D. Tex. Mar. 30, 2000)).

MDA knew about Plaintiff's complaints on November 26, and December 2, 2019, because those complaints were filed and/or served directly on MDA and UTH after which Defendant took materially adverse actions against Doe on March 11, 2020, in close

temporal proximity to his making those complaints, a mere ***three months*** after his complaints seeking protection from discriminatory treatment:

1. Imposition of coerced mental health therapy following Doe's November 16, and December 2, 2019 complaints.;

2. Continued suspension following the November 16, and December 2, 2019 complaints despite no finding of guilt.;

3. Imposition of an earlier national examination deadline, as compared to a date previously provided by Defendant to John..

Dkt. 13, ¶ 84.

Likewise, after Doe filed his EEOC/TCHRA charge against MDA on June 3, 2021, Defendant continued to impose psychiatric requirements and other disparate employment actions on John in the workplace, and which continue to stigmatize him to the present. [Dkt. 13.1, Exb. 18a, pp. 4-5]. Specifically, on March 11, 2020, 105 days or approximately three months after his November 26, 2019 complaint, and 99 days or approximately three months after his December 2, 2019 complaint, Plaintiff was advised that he could not resume his medical studies (and therefore his suspension continued), absent his agreement to undergo one year of psychiatric / mental health therapy at his own cost. [Dkt. 13, ¶ 84]. Doe was also informed that he was required to take the USMLE Step 1 Exam by July 1, 2020, which is contrary to the policy stated in MMS's Academic Policies and Guidelines which did not require the examination until much later. *Id.;* Dkt. 13, ¶ 66]. MDA retaliated against Plaintiff even further by requiring a punitive management plan for his return to MDA that isolated and denigrated Plaintiff from his co-workers. [Dkt. 13.1, Exb. 18a, pg. 4-5]. Further, approximately one month later on March 26, 2020, MDA refused to institute

any investigation of Plaintiff's complaint against Cai for stalking and having filed false allegations of sexual harassment, and providing little to no basis for such decision and no opportunity to appeal. [Dkt. 13, ¶ 85]. On April 24, 2020, Gibson, as threatened during his interrogations of Plaintiff, issued a preliminary report determining that Doe's accusation that Cai had falsely accused him of sexual harassment represented a violation of Defendants' anti-retaliation policy. [Dkt. 13, ¶ 87, 92-93].[10]

Cai, on the other hand, remains at the DePinho Lab even now. *Id.* After filing his charge of discrimination on June 3, 2022, MDA has continued to impose disparate terms and conditions of employment on Plaintiff, including his continued demotion and/or reassignment from the DePinho Lab. [Dkt. 13, ¶ 93-96]. The timing of Doe's complaints and MDA's retaliatory acts not only falls within the range of temporal proximity of four months or less for causation purposes, but significantly, the direct evidence of retaliatory animus by MDA against Doe provides additional evidence of materially adverse employment actions sufficient to state a retaliation claim along with the existence of a hostile work environment.

## C.     PLAINTIFF PROPERLY STATES A TITLE IX CASE

Title IX generally provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial

---

[10] Gibson failed to conduct a proper investigation and talk to first-hand witnesses whose identities were provided to him, and was forced to reopen the investigation when Doe provided a written witness statement contradicting the Cai false allegations.  Despite these failures, there was a violation of policy found by MDA against one of the investigators that wrongfully interrogated Doe in violation of applicable policy.

assistance." 20 U.S.C. § 1681. Doe's pleading properly states erroneous outcome and selective enforcement forms of Title IX violations. *See also,* Sections B, B-1, and B-2, *supra.*

### 1.    Plaintiff States a Title IX Erroneous Outcome Claim

A university can face Title IX liability for imposing discipline where gender is a motivating factor for the decision under two general theories, erroneous outcome and selective enforcement. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Klocke v. Univ. of Texas at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019), *cert, denied,* 140 S.Ct.1268 (2020). In order to state an erroneous-outcome claim, a plaintiff must plead:  (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding, and (2) a particularized ... causal connection between the flawed outcome and gender bias; however, as the court in *Yusuf* observes, that pleading burden is not heavy. *Yusuf, supra,* 35 F.3d at 715. A Title IX violation can be shown by a complaint that alleges particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant, particularized strengths of the defense, or other reason to doubt the veracity of the charge. *Id.* A complaint may also allege particular procedural flaws affecting the outcome. *Id.* The outcome of Defendants' response to Cai's allegations is not only clearly unreasonable in light of the known circumstances, it is shocking that even though none of the allegations resulted in findings of guilt in any form or fashion against Doe, Plaintiff was punished within Defendants' school and workplace and subjected to harsh work place/environment and educational restrictions and/or ramifications.  [Dkt. 13, ¶ 145-154].

25

***Facts Sufficient to Cast Articulable Doubt on the Accuracy of the Outcome***

Defendants' Title IX investigation found no evidence to corroborate Cai's false allegations that Doe had engaged in sexual harassment or stalking. Despite those findings, Defendants continued its investigation and suspension of Doe for more than one and one-half years.  Even then, no finding was made by the SEPC regarding a possible violation of Principle 9. [Dkt. 13, ¶160; Dkt. 13.1, ¶ 5b, p. 6-7].  Code of Conduct Principle 9 provides that "[w]e affirm the need to demonstrate ***mutual respect*** and to acknowledge interdependence as co-workers responsible for the welfare of patients.". [Dkt. 13 fn. 45; Dkt. 13.1 Ex. 5b](emphasis added). There is nothing "***mutual***" about Doe's outcome resulting from Cai's false allegations compared to Cai's outcome following Doe's accusations against Cai. Particular evidentiary weaknesses behind the alleged offenses resulting in an erroneous outcome include, but are not limited to:

1. Accuser's motive to lie-Dkt. 13, ¶¶ 31-37;

2. Reasons to doubt the veracity of the charge and facts showing Cai was discredited as a complainant and witness-Dkt. 13, ¶¶ 45-46, fn. 16, 56-59, 124;

3. Procedural irregularities / policy violations undermining the validity of the proceedings and outcome-Dkt. 13, ¶¶39-48, 50-51, 53, 55, 58-59, 61, 66, 70-71, 73-80, 91;

4. Continued suspension from medical school and the DePinho Lab even after cleared of charges-Dkt. 13, ¶¶ 124 (p)(They referred and/or facilitated the referral of Plaintiff to the University of Texas Medical School ("UTMS") for further punitive proceedings despite the evidence clearly establishing that none of Cai's complaints of sex harassment or stalking were corroborated. . . ).

Defendants point to the statement that "…Cai told [them] that it made her uncomfortable when [Doe] greeted her, talked to her, or said anything to her. By his own

testimony, [Doe] acknowledged that he continued to greet and talk to Cai even though she told him it made her (Cai) uncomfortable." [Dkt. 13.1, ¶ 5b, p. 5]. The Executive Summary noted that Doe "confirmed that he [Doe] was 'getting tired of trying to work things out' with Cai and highlighted an exchange based on an incomprehensible English translation of a comment Doe allegedly made in the Mandarin digital application to the effect that "[i]n order to make you hate me more, I am willing to make sacrifices and do a lot of things that hate vicious dislike.[11]" [Doe] explained that he was referencing not being able to work with Cai as a colleague. *Id.* Significantly, Defendants refused to credit Plaintiff's clear intent to resolve whatever issue Cai had with him but found nothing remotely wrong or questionable about Cai's demand that Doe cease greeting or speaking with her. Moreover, Cai was deceptive, continuing to talk with Doe during this entire time period despite her earlier demand he not talk to her. Defendants instead referred Doe, but not Cai, for committee review for questions about his "mutual respect" under Principle 9, apparently because he continued to try to work things out with Cai.

***A Particularized Causal Connection Between the Flawed Outcome and Gender Bias***

Causation sufficient to state a Title IX discrimination claim can be shown in a number of ways including via ". . . patterns of decision-making that also tend to show the influence of gender." *Yusuf,* 35 F.3d at 715. The following factors show evidence of a causal connection between the flawed outcome of continuing to discipline Doe despite no finding of guilt thus reflecting a pattern of gender-based decisions:

---

[11] Cai and Doe would communicate in Mandarin as Cai's preferred method of communication. Doe was not fluent in Mandarin while Cai was. This comment was translated from Mandarin into English and is essentially incomprehensible. Dkt. 13, ¶¶ 33-35.

- Defendants created a systemic wide approach to sexual harassment claims that embraced the allegations of female accusers as summarily true and to be believed while treating accused males as guilty until proven innocent, that males accused of sexual misconduct on college campuses are always responsible. This is shown by Defendants' decision to immediately suspend Doe without any corroboration of Cai's allegations of sexual harassment or stalking by any witness. [Dkt. 13, ¶ 111 (q), 112, 124, 127, 137, 142, 145, 143-154, 160 (r)] and to continue the suspension despite findings to the contrary;

- In January, 2021, Defendant McNeese of UTH, the lead official over the accusations against Doe, served as a panelist for a university-wide screening of the documentary ["Picture a Scientist"], which portrays men in academic science as perpetrators of sexual discrimination and sexual harassment against women, and blaming men as the direct cause for not enough women pursuing successful STEM careers. Along with other prominent UTHealth faculty, McNeese encouraged and promoted discourse and discussion among attendees that singled out men as perpetrators of sexual discrimination and sexual harassment in academia and advocated for harsher treatment of men that are accused, demonstrating the inherent biases and prejudices that created and/or perpetuated the discriminatory treatment of John and the due process and other violations as alleged herein. Defendant McNeese is the same Institutional Official who issued the decision referring Doe to the SEPC for evaluation of a possible violation of Principle 9 of the Student Code of Conduct, a decision that contributed to Plaintiff's continued banishment from his work and educational studies. [Dkt. 13, ¶ 128; 13.1, Exbs. 5b, 6, 10, 17].

- The systemically gender-biased systems at MDA and UTHealth encouraged and fostered an environment that promoted preconceived notions and beliefs favoring and giving presumptive credence to female complainants, as shown by Defendants' decision to maintain their suspension of Doe despite finding no corroboration of Cai's sexual harassment or stalking allegations. [Dkt. 13, ¶¶ 128, 111, 112, 124, 127, 137, 142, 145, 143-154];

- Institutional Defendants, MDA and UTHealth, were found to have violated the Clery Act requirements by the Clery Act Compliance Division of the FSA. [Dkt. 13, ¶ fn 3, p. 17], by violating Doe's due process rights. Clery Act, 20 USC §1092, *et seq.*

- The reasonable approach to finding no corroboration to any of Cai's allegations of sexual harassment and stalking, as well as testimony directly contrary to Cai's accusations, is to have dropped the complaint and allowed Doe to immediately return to work in good standing at medical school. Instead, Defendants continued to refuse to allow Doe to return to work or school, pursued him based on the

vaguely-worded Principle 9 violation, and imposed disparate terms. [Dkt. 13, ¶ 50, 111, 112, 124, 127, 137, 142, 145, 143-154];

- Sex-based discriminatory treatment, including but not limited to imposition of a "Management Plan" that would put severe restrictions on John and his ability to continue his work and education, while required to defer to the false accuser's schedule, whims and wishes. [Dkt. 13, ¶¶ 20-21, 23, 28, 30-34, 45, fn. 15, and 16, 46, 65, 67, 69, 70-74, 84, 92-93, 111, 112, 124, 127-128, 137, 142, 145, 143-154; Dkt. 13.1, Exbs. 7, 9-10].

These allegations, accepted as true, and with all inferences taken in favor of Plaintiff for the purposes of this response, state a plausible erroneous outcome Title IX claim.

In addition, the clear procedural irregularities outlined throughout, including but not limited to suspending Doe, disciplining him despite being found not responsible, and forcing him to submit to psychological testing, create a plausible inference of sex discrimination *See Doe v. Texas A&M Univ.*, No. H-20-4332, 2021 WL 257059, at ** (S.D. Tx. Jan. 26, 2021) ("While the Fifth Circuit has not directly addressed the issue, other circuits have found that "clear procedural irregularities . . . will permit a plausible inference of sex discrimination. *Doe v. Oberlin*, 963 F.3d 580, 587 (6th Cir. 2020); quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019)).")

## 2.     Plaintiff States a Title IX Selective Enforcement Claim

To succeed on a selective enforcement theory, Plaintiff must show that regardless of his guilt or innocence, the decision to initiate the disciplinary proceedings against him and/or the severity of his punishment was motivated by gender bias. *See Klocke*, 938 F.3d at 213; *Yusuf*, 35 F.3d at 715; *Lozano v. Baylor Univ.*, 408 F.Supp.3d 861, 882 (W.D. Tex.

2019).[12] Plaintiff incorporates his discussion in Sections A, B and C.1., *supra*, discussing sex discrimination as if fully set forth herein.    Defendants summarize the grounds for pursuing the sexual harassment policy against Doe based on an email sent by Cai that alleged "she felt sexually harassed by [Doe]", yet none of the allegations under investigation involve actions that could be characterized as sexually motivated. Defendants' policy defines sexual harassment as "[a] form of sex discrimination that includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, and/or conduct of a sexual nature." [Dkt. 13.1, Exb. 1a, p. 3]. None of Cai's allegations (which Doe asserts are utterly false) are described as sexually motivated.   None were observed by any other person in the same lab. *Id.* Consequently, there are significant disparities in the enforcement of investigational and disciplinary actions taken despite the fact that both Doe and Cai were accused of violating the Sexual Misconduct policies, one accused of sexual harassment and stalking, and the other of stalking and filing a false report of sexual harassment:

| MDA/UTH ACTIONS RELATING TO DOE | MDA/UTH ACTIONS RELATING TO CAI |
| --- | --- |
| Defendants immediately suspended Doe following the S.H. allegations and prior to any substantive investigation. [Dkt. 13, ¶ 46-7, 145] | Defendants never suspended or removed Cai from her job or studies, and never furthered criminal charges following Doe's complaint against Cai of stalking and falsely accusing him of S.H. [Dkt. 13, ¶ 85] |

---

[12] Defendants assert that "[t]he comparator cannot be the person who accused the plaintiff," based on citation to an unpublished Northern District of Ohio case, *Doe v. Case Western Reserve Univ.*, No. 14-2044, 2015 WL 55220001 * 6 (N.D. Ohio, Sept. 16, 2015)(unpublished). Even if that case stood for this proposition, which it does not, it would have been overruled by the Sixth Circuit's exact opposite holding in *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018), that the comparator *can be* the person who accused the plaintiff. *Id.* at 593-96.

| | |
|---|---|
| Defendants continued to bar Doe from his school and employment for nearly two years despite dismissal of the sexual harassment charges within three months of the allegation. [Dkt. 13, ¶ 145] | Defendants did not bar Cai from school or employment at any time [Dkt. 13, ¶ 85] but instead continued to impose disparate treatment on Doe compared to Cai |
| Defendants would not allow Doe to return to continue his research at the DePinho Lab despite dismissal of the S.H. charge, and only permitted return to employment/school at a different Lab or under punitive management conditions impugning his mental health and treating him as if he had been found guilty though he had not. [Dkt. 13, ¶ 145]. | Defendants did not bar Cai from school or her work at the DePinho Lab nor impose any study or workplace restrictions of any kind. [Dkt. 13, ¶ 85] |
| Defendants pursued S.H. charges against Doe even though the charges against Doe did not amount to S.H. under their own policies. [Dkt. 13, ¶ 145; 13.1, Exb. 1a. | Defendants refused to pursue charges of filing a false charge of S.H. or acknowledge that such behavior warranted an investigation of the false accuser. [Dkt. 13, ¶ 85; 13.1, Exb. 1a] |
| Defendants issued warnings to Doe about talking/tampering with witnesses which prevented him from being able to mount a defense. [Dkt. 13, ¶ 45 and fn. 15] | Defendants did not issue warnings to Cai about talking/tampering with witnesses. [Dkt. 13, ¶ 45 and fn. 15] |
| Defendants persisted in their disciplinary actions against Doe, including extended unreasonable suspension, despite the fact that witnesses contradicted Cai's version of the events. [Dkt. 13, ¶ 45, fn. 16; 13.1, Exb. 9] | Defendants took no action against Cai when her witnesses wholly contradicted Cai's version of events, and largely corroborated John's version of events. [Dkt. 13, ¶ 45, fn. 16, 85; 13.1, Exb. 9] |
| Defendants asserted a Management Plan and Risk Assessment against Doe which was then used in the SEPC meetings based on the assumption that Cai's claims were true, when in fact the neutral witness testimony reflected otherwise. [Dkt. 13, ¶ 45; 13.1, Exb. 9] | Defendants refused to refer Cai for an investigation of Doe's complaints, refused to refer her for falsely filing a complaint and refused to investigate her for unprofessional conduct. [Dkt. 13, ¶ 45, 85; 13.1, Exb. 9] |

Defendant McNeese, the UTH Title IX coordinator, oversaw the investigation and disciplinary action against Doe and publicly encouraged and promoted discourse and discussion among attendees at a UTH conference that singled out men as perpetrators of

sexual discrimination and sexual harassment in academia **_and advocated for harsher_** **_treatment of men that are accused._** [Dkt. 13, ¶ 128; 13.1, Exb. 17]. Therefore, in addition to publicly-stated bias by Defendants' key Title IX official, Plaintiff also states enumerable examples showing a distinct pattern of selectively enforcing policies motivated by gender bias against men. [Dkt. 13, ¶ 20-21, 23, 28, 30-34, 45, fn. 15 and 16, 65, 67, 70-74, 85, 92-94, 124; Dkt. 13.1 Exbs. 5b, p.2, 9-10]. In just one example, Cai claimed that Doe literally chased her down a hallway, yet Defendants' own investigation revealed: "[w]itness testimony failed to corroborate Cai's assertion that [Doe] was observed by two colleagues chasing Cai down the hall. The witness attested that Cai's behavior was "quite normal" when she (Cai) walked up, gave the witness a hug, . . . [c]ontrary to Cai's assertion, the witness affirmed that [Doe] was only observed passing through the hallway. Cai's allegation that [Doe] follows her during lunch and after work are both unsubstantiated." *Id.* at p. 3. Although Defendants have no choice but to acknowledge that Cai's allegations of sexual harassment are unsubstantiated if not outright contradicted, none of Cai's misrepresentations generated any interest in the type of investigation and disciplinary action dispensed against a male co-worker in such a manner as to destroy his personal and professional reputations and return him to a restricted work and school environment utterly humiliated and isolated from his peers and colleagues. *Id.* Yet, Defendants protected Cai from conduct violations based on demonstrably false allegations, to protect her and avoid potential negative publicity. Accordingly, the repeated instances of disparate treatment noted in Plaintiff's complaint reflect a clear pattern of selective enforcement motivated by

gender bias, thereby establishing that Doe states a viable selective enforcement Title IX claim.

## D.   PLAINTIFF STATES A TAKINGS CLAIM UNDER THE TEXAS CONSTITUTION

The Texas Constitution states that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made." Tex. Const. art. 1, § 17. The elements of a state takings claim are: "(1) the State intentionally performed certain acts, (2) that resulted in a taking of property, (3) for public use." *Smith v. Lutz*, 149 S.W.3d 752, 760 (Tex. App.–Austin 2004, no pet.); *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001). The Takings Clause may include personal property. *Renault, Inc. v. City of Houston*, 415 S.W.2d 948, 952 (Tex. Civ. App.—Waco 1967), *rev'd on other grounds*, 431 S.W.2d 322 (Tex. 1968).

Plaintiff asserts a plausible claim for violation of the Takings Clause against Defendants UTH and MDA when they improperly took Doe's rights to the Howard Hughes Medical Institute research grants which he applied for and were ***awarded to him***, ***not MDA or UTH,*** and to the taking or destruction of John's research, both personal property intended for public use. [Dkt. 13, ¶¶ 155-56, 106-154, 157-163]. As Doe alleges:

> His research projects at the DePinho Lab were going well. **John had just received the second of two illustrious and prestigious HHMI grants and was working on another incredibly significant grant that would provide substantial funding for a good portion (if not the remainder) of John's medical/graduate studies**. John's hard work was paying off, and he was intent on continuing and completing his educational and cancer-research/work-related goals at UTHealth and MDA. The grant application on which John was working diligently for exceptionally long hours for many weeks would help fund the remainder of his MD/PhD training, including paying for his tuition and health insurance, and provide to John and his family a stipend for 5 years.

Dkt. 13, ¶ 32 (emphasis added).

Without reference to any controverting authority, Defendants argue that they did not "***take*** Plaintiff's HHMI grant and funding, much less take it for ***public use***". That assertion has no weight in a motion to dismiss where the court's assessment focuses on Plaintiff's plausible allegations, not on Defendants' unsupported denials. In this instance, Defendants acknowledge, and Doe's pleadings support the position that ***HHMI awarded Doe*** a two-year research grant and funding to be implemented under the auspices of the Lab. [Dkt. 13, 32, 46]. The Howard Hughes Medical Institute awards fellowships ***to students*** from research institutes and medical schools across the country. *Id.* Defendants argue that a second grant cannot be considered because the second award had not as yet been awarded as yet.  But Defendants ignore the fact that Doe generated significant research materials supporting an award of that additional grant. *Id.*  Moreover, the HHMI research is property that is designed for public use as is all of the research conducted in the DePinho Lab and therefore sufficient to make out a Takings' Clause claim.

Defendants rely on *Lewis v. Wash. State Univ.*, 586 F. App'x 271, 271 (9th Cir. 2014)[13](unpublished) and *Kalderon v. Finkelstein*, 495 F. App'x 103, 107 (2d Cir. 2012)(summary order)[14] for the proposition that other circuits have rejected arguments that faculty have a property interest in research grants, a position that Plaintiff does not allege because he is not a faculty member overseeing a grant but rather a student and employee

---

[13] *Lewis, supra,* is an unpublished ninth circuit opinion in which Lewis claimed he had a property interest in his position as a Director over a NARA grant.

[14] *Kalderson, supra,* is a summary order from the second circuit having no precedential effect dismissing claims under the first and fifth amendment and 42 U.S.C. δ 1985.

awarded a fellowship grant in his own name. [Dkt. 13, ¶¶ 32, 46]. Defendants then contend Plaintiff seems to base his takings claim in part on an alleged property interest in his employment, referencing *Bates v. Tex. State Technical Coll.,* 983 S.W.2d 821, 826 n. 8 (Tex. App.—Waco 1999, pet. denied) for the proposition that "Property," as found in article I, section 17 does not include any alleged property interest in employment. However, *Bates,* which erroneously limits the definition of property under the Takings Clause to real property conflicts with *Renault* as well as the more recent Texas Supreme Court's treatment of "property" under the Takings clause in *City of Harlingen v. Obra Homes, Inc.*, No. 13-02-268-CV (TX 1/13/2005) (Tex. 2005). As the Texas Supreme Court clarified in *Obra,* citing *Renault, Inc. v. City of Houston,* 415 S.W.2d 948, 952 (Tex. Civ. App.—Waco 1967), *rev'd on other grounds,* 431 S.W.2d 322 (Tex. 1968), the word "property" as used in the Takings clause refers to "*every species of propert*y." The Texas Court of Appeals in *Renault,* 415 S.W.2d at 952*,* further makes clear, "[t]he terms 'property' as used in the Fifth Amendment to the Federal Constitution relates to every species of property, including personalty. *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434. It also means this under the Texas Constitution." *Renault, supra,* citing *Gulf, C & S.F. Ry. Co. v. Fuller,* 63 Tex. 467, 469 (1885). Defendants argue without statutory or case law authority that Plaintiff had no compensable property interest in Defendants' research on which he may have worked as a student or employee; yet, Plaintiff did have a property interest in his HHMI fellowship and his research materials which were awarded to him and completed by him. [Dkt. 13, ¶¶ 32, 46].

Defendants argue that a Takings Clause violation is governed by the two-year statute of limitations for damage to property, citing *Grunwald v. City of Castle Hills*, 100 S.W.3d 350, 353 (Tex. App.—San Antonio 2002, no pet.) a land dispute case which states that "[c]ourts have held that an action for a physical or regulatory taking is barred after the expiration of the ten-year period of limitations, but that an action for damage to property is governed by the two-year period of limitations,"; but Defendants' citation to *Yee v. City of Escondido,* 503 U.S. 519, 522, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) and *State v Southwind Auto Sales*, 951 S.W.3d 849 (Tex. App.—San Antonio 1997, no writ) are similarly unhelpful because both fail to address limitations under a Takings' Clause claim. Arguably, a Takings' Clause claim as set forth in Article 1, § 17 is a claim not otherwise listed under the limitations code provisions and should therefore be subject to the residual limitations' statute, Tex. Rev. Civ. Prac. & Rem. Code § 16.051 ("Every action for which there is no express limitations period, except an action for the recovery of real property, must be brought not later than *four years after the day the cause of action accrues*." *Wider v. First City Bank of Dallas*, 804 S.W.2d 160, 162 (Tex. App.—Dallas 1990, writ denied)(violation of statutorily imposed duty subject to the residual limitations statute of four years).

Assuming a two-year statute of limitations applies for argument purposes, Defendants' taking of Doe's HHMI fellowship grant benefits did not accrue until after February 28, 2019 when Doe learned Defendants would not allow him to return to his Lab and continue his fellowship after he had been cleared of sexual harassment and stalking charges, (placing the negative grant ramifications within the two-year

limitations period). Finally, the destruction of his research and materials are facts that were not discovered by Doe until September 2020 when he was finally able to return to MDA and search for his research and research materials and found they had been destroyed.  [Dkt. 13, ¶¶ 40-42, 69, 92, 94-95]. The discovery rule applies in cases in which the nature of the injury incurred is inherently undiscoverable and the evidence is objectively verifiable. *Murphy v. Campbell*, 964 S.W.2d 265 (Tex. 1998); *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex.1996); Defendants banned Doe from the DePinho Lab and from any and all portions of Defendants' campuses. [Dkt. 13, ¶ 41-43].   The discovery rule applies to render his claim timely since he only learned about its loss in September, 2020 when he was finally permitted to re-enter the MDA premises.  [Dkt. 13, ¶92]. This not only places Defendants' destruction of Doe's research within a four-year statute of limitations, but because of the discovery rule, also within a two-year statute of limitations.

## **CONCLUSION**

For all of these reasons, Plaintiff moves that the Court deny Institutional Defendants' motion to dismiss in its' entirety.

Respectfully submitted,

KRENEK LAW OFFICES, PLLC

*/s/ Eddie M. Krenek*
Eddie M. Krenek
Texas Bar No. 11724980
Federal Bar No. 10887
edkrenek@kreneklaw.com
*Lead Attorney-In-Charge*

37

Tricia K. Thompson
Texas Bar No. 24031324
Federal Bar No. 841498
tkthompson@kreneklaw.com
Joyce A. Keating
Texas Bar No. 11144010
Federal Bar No. 14159
joyce@joycekeatinglaw.com
21555 Provincial Blvd.
Katy, Texas 77450
Telephone: (281) 578-7711
Fax: (281) 578-8988

**_ATTORNEYS FOR PLAINTIFF JOHN DOE_**


## CERTIFICATE OF SERVICE

The undersigned certifies that on the 28th day of April, 2022, this response was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel for Defendants:

Jeffrey E. Farrell
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
jeffrey.farrell@oag.texas.gov

_/s/ Eddie M. Krenek_
Eddie M. Krenek