United States District Court
Southern District of Texas
**ENTERED**
January 30, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN DOE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:21-CV-1356 |
| | § | |
| THE UNIVERSITY OF TEXAS M.D. | § | |
| ANDERSON CANCER CENTER, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are two motions to dismiss. The first motion was filed by Defendants University of Texas M.D. Anderson Cancer Center ("MDA") and University of Texas Health Science Center at Houston ("UTH"), to which the parties refer collectively as the "Institutional Defendants." That motion (Dkt. 30) is **GRANTED IN PART AND DENIED IN PART**. The second motion was filed by Defendants Margaret McNeese ("McNeese"), Tiffany Obeng ("Obeng"), Michael Redwine ("Redwine"), Deana Moylan ("Moylan"), Sheri Wakefield ("Wakefield"), Yolan Campbell ("Campbell"), Karen Reed ("Reed"), Vicki King ("King"), and Kimberly Miller ("Miller"), to whom the parties refer collectively as the "Individual Defendants." That motion (Dkt. 31) is also **GRANTED IN PART AND DENIED IN PART**.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff John Doe ("Doe") accuses Defendants of mishandling an investigation into allegations that he sexually harassed and stalked Lily Cai ("Cai"), with whom Doe worked in a lab at MDA.

Doe began medical school at UTH in 2015. (Dkt. 13 at p. 20). Shortly thereafter, Doe began working part-time at MDA in the research laboratory of Dr. Ronald DePinho ("Dr. DePinho" and "the DePinho lab"). (Dkt. 13 at pp. 20–21). During his second year of medical school, Doe received a research grant from the Howard Hughes Medical Institute Medical Research Fellows Program ("HHMI") and was accepted into a dual-degree MD/PhD program at UTH, though he did not immediately enroll in that program. (Dkt. 13 at p. 21; Dkt. 13-1 at p. 164). Doe then took a one-year leave of absence from his medical school studies to work full-time in the DePinho lab as part of the HHMI fellowship. (Dkt. 13 at p. 21; Dkt. 13-1 at p. 239). While working at the DePinho lab and on leave from medical school, Doe applied for and received a second research grant from the HHMI. (Dkt. 13 at pp. 21–22). In April of 2018, UTH approved Doe's request for a second year of leave from his medical school studies so that he could take the second HHMI grant and continue working full-time in the DePinho lab. (Dkt. 13-1 at p. 239). After the leave approval, Doe was scheduled to return to medical school at UTH as a third-year student in the spring of 2019. (Dkt. 13-1 at p. 239).

While working in the DePinho lab, Doe met Cai. Born and educated in China, Cai was a graduate student at UTH who began working as a graduate research assistant in the DePinho lab in 2017. (Dkt. 13 at pp. 21, 24). The DePinho lab group was small; only four graduate students (counting Cai and Doe) worked there. (Dkt. 13 at p. 22). All of the graduate students were female except for Doe. (Dkt. 13 at p. 22).

According to Doe's live complaint, Doe "interacted with Cai in ways similar to how he interacted with other co-workers." (Dkt. 13 at pp. 22–25). However, Doe's "extremely

limited ability to communicate in Mandarin" and Cai's "limitations in the use of the English language" made it very difficult for Doe and Cai to understand each other unless they were using "Mandarin to English and English to Mandarin social media and phone apps[.]" (Dkt. 13 at pp. 24–25). Even with the help of the apps, which were "difficult to use," there was a language barrier; the apps, "simply because of the inherent nature of the languages involved[,]" did not always translate messages correctly. (Dkt. 13 at p. 24). Nevertheless, in his live complaint Doe describes his interactions with Cai as "sociable, normal and pleasant." (Dkt. 13 at p. 25).

Cai's perception of the communications between her and Doe was evidently quite different. In October of 2018, about a year after Doe and Cai started working together, Cai sent an email to Dr. DePinho in which she accused Doe of sexually harassing and stalking her. (Dkt. 13 at p. 26). A criminal proceeding against Doe, as well as a joint investigation by UTH and MDA of Cai's allegations, soon followed.

*—The criminal proceeding against Doe*

UTH campus police questioned Doe in November of 2018. (Dkt. 13 at p. 26). After Doe was questioned, he was charged by information with a misdemeanor violation of Section 42.07(a)(7) of the Texas Penal Code ("the electronic-communications-harassment statute"). (Dkt. 13-1 at pp. 202–19). The affidavit supporting the charging instrument was sworn out by Miller, a UTH police detective; and Miller said in her affidavit that Cai had told her that Doe had spent months "following [Cai] and trying to talk to her" after she told him to stop. (Dkt. 13-1 at p. 202). According to Cai, Doe, as he says in his live pleading, began "sending messages through a chat app on her phone[;]" but Cai told Miller that she

"told [Doe] to stop contacting her" and "blocked [Doe] in the app[.]" (Dkt. 13-1 at p. 202).

Cai further told Miller that Doe "continued to send harassing emails and follow [Cai]" after

Cai "advised [Doe] in email and in person on multiple occasions to stop following her and

attempting to communicate with her[.]" (Dkt. 13-1 at pp. 202–03). Miller's affidavit

included the following quote from an email that Doe sent to Cai on October 29, 2018: "I'm

willing to sacrifice by committing many more annoying and disgusting sins in order to help

you hate me even more." (Dkt. 13-1 at pp. 202–03). Cai told Miller that she was "afraid

that [Doe] w[ould] harm her." (Dkt. 13-1 at p. 203).

Doe successfully moved to dismiss the criminal information filed against him on

the basis that the electronic-communications-harassment statute is facially

unconstitutional. (Dkt. 13-1 at p. 204). The trial judge expressly "did not consider the

factual merits" of the case against Doe. (Dkt. 13-1 at p. 204). The Fourteenth Court of

Appeals of Texas affirmed. (Dkt. 13-1 at p. 218). However, the Texas Court of Criminal

Appeals vacated the Fourteenth Court's judgment and remanded the case to that court for

further consideration in light of two recent opinions in which the Court of Criminal Appeals

held that the electronic-communications-harassment statute is facially constitutional. *See

Ex parte Chen*,[1] --S.W.3d--, 2022 WL 17171098 (Tex. Crim. App. Nov. 23, 2022). Doe

---

[1] To the extent possible, the Court, like the parties, has referred and will continue to refer to Doe by his pseudonym, despite Doe's failure to extend that same pseudonymous courtesy to Cai. However, the Court includes this case citation despite its use of Doe's real name because the appellate decisions examining Doe's criminal case are important (and judicially noticeable) contextual facts that are a matter of public record. The Court further notes that Doe included his real name in documents that he attached to his live complaint. (Dkt. 13-1 at pp. 163, 179, 278). Doe also filed a civil lawsuit against Cai in Texas state court using his real name. *See Cai v. Chen*, No. 14-20-00588-CV, 2022 WL 2350049 (Tex. App.—Houston [14th Dist.] June 30, 2022, pet. filed).

has filed a petition for a writ of certiorari with the Supreme Court. *See* United States Supreme Court docket number 22-497.

> —*MDA's report on Cai's allegations*

MDA placed Doe on paid investigative leave in November of 2018. (Dkt. 13-1 at p. 156). Reed, a human resources specialist in the Equal Employment Opportunity and Human Resources Regulations Department at MDA, conducted MDA's part of the joint MDA/UTH investigation. (Dkt. 13-1 at p. 190). Reed concluded that, while "there was insufficient evidence to substantiate a violation of [MDA's] Sexual Harassment and Sexual Misconduct Policy[,]" she found "sufficient evidence to substantiate a violation of Principle Nine of [MDA's] Code of Conduct." (Dkt. 13-1 at p. 190).

Principle Nine of MDA's Code of Conduct ("Principle Nine") reads, "We affirm the need to demonstrate mutual respect and to acknowledge interdependence as co-workers responsible for the welfare of patients." (Dkt. 13 at p. 78). The conduct found by Reed to be potentially violative of Principle Nine revolved around Cai's allegations that Doe continued to contact her after she told him to leave her alone. (Dkt. 13-1 at p. 193). According to Reed's investigative report, "[e]vidence confirmed that Cai communicated to [Doe] in email that she did not want to be his friend and did not want to talk to him." (Dkt. 13-1 at p. 193). Reed wrote in her report that she obtained significant evidence to that effect from Doe himself, who "affirmed that Cai told him in an email that she was fearful of him" and "admitted during the investigative process that Cai may have found his behavior and actions threatening." (Dkt. 13-1 at p. 193). Reed further wrote that:

[b]y his own testimony, [Doe] acknowledged that he continued to greet and talk to Cai even though she told [Doe] it made her (Cai)[2] uncomfortable. While [Doe] did not perceive his communications with Cai as threatening, [Doe] acknowledged that his communications with Cai became escalated. [Doe] further acknowledged that his tone also became more argumentative. Dkt. 13-1 at p. 193.

*—UTH's report on Cai's allegations*

When Cai's allegations against Doe were made and investigated, Doe was classified as a UTH student, though he was on leave from his medical school studies and had not yet enrolled in his dual-degree MD/PhD program. (Dkt. 13-1 at p. 164). Obeng, an equal opportunity advisor in the Diversity and Equal Opportunity Department at UTH, conducted UTH's part of the joint MDA/UTH investigation. (Dkt. 13-1 at p. 190).

Obeng's investigative report reached conclusions similar to those of Reed's report. Obeng was unable to confirm that Doe had sexually harassed Cai, but she found evidence that: (1) that Doe had "continued messaging [Cai] after she asked him to stop[;]" (2) that Doe had "sent threatening[3] messages to [Cai;]" and (3) that "[Cai] was fearful of [Doe.]" (Dkt. 13-1 at pp. 164–88). In her report, Obeng included a copy of a lengthy email exchange between Doe and Cai that was initiated by Doe and took place in late October of 2018. (Dkt. 13-1 at pp. 177–81). The October 2018 email exchange between Doe and Cai was apparently written in Mandarin, but Obeng's report contains an English translation. (Dkt. 13-1 at pp. 177–81). In the exchange, Cai repeatedly accuses Doe of harassing her and asks

---

[2] Bracketed words and letters in this quote and in other quotes from the record in this case were included by the Court, but this specific parenthetical clarification was contained in Reed's report.
[3] Obeng's report defines "threatening" as "intimidating, bullying, hostile." (Dkt. 13-1 at p. 177).

him to stop. (Dkt. 13-1 at pp. 177–81). Cai's first email (out of four that she sent) reads, in

its entirety:

> 别再废话，请勿骚扰
> Translation: Don't talk nonsense. stop your harassment!

Dkt. 13-1 at p. 180.

Her second email reads:

> >>>>> 由于你多次骚扰和不正常行为，影响我的工作，造成我内心恐惧和阴影，便我对你非常反
> 感，为此反复和你多次说明过这个问题，可你还在骚扰、纠缠，你是否应该问问自己，都在一个
> 实验室工作又何必欺人太甚呢？
> >>>>>
> >>>>> Translation: Because of your repeated harassment and abnormal behavior, you affected my work
> and caused fear to me and negatively impacted me. I am very disgusted with you. For this reason, I have
> repeatedly told you about this problem, but you are keeping harassing me. You should ask yourself. We
> are working in the same lab and you shouldn't intimidate me anymore.

Dkt. 13-1 at p. 180.

And in her third and fourth emails, Cai again accuses Doe of harassment and says

to him, "I hope you stay away from me." (Dkt. 13-1 at p. 180).

In his emails during the October 2018 exchange, Doe appears to grow increasingly

agitated by Cai's accusations of harassment, culminating in this email:

> 你昨天那麼晚回去，今天還来的比平常早那麼多，不會困嗎？我只把你當師妹看待，我没有其他
> 意思，是你自己想多了，這性对你無成傷害。你對我说多少謊言都改不了你自己明白的事實。
> 我知道確你很失望，很委屈，你需要躲我需要你妈的安慰，我不驚讶。如果你必須恨我你就恨吧。
> 為了帮你多恨我一些，我願意做犧牲，做很多很多討厭怨性反感的事。
> Translation: You went home so late yesterday, and today you still came much earlier than usual, would
> you not feel sleepy? I only treat you as one of my fellow students, I have not thought about our
> relationship as something else, you think too much of our relationship, and blame me for hurting you.
> No matter how many lies you have told me, it can't change the fact you know what is going on. I know
> that you are very disappointed and very aggrieved. You need to hide from me and need your mother to
> comfort you, at which I am not surprised. If you have to hate me, then let it be. In order to help you hate
> me more, I am willing to make sacrifices and do a lot of things that make you hate and dislike me.

Dkt. 13-1 at p. 179.

*—Doe's allegations against Cai*

In December of 2019, after UTH and MDA had completed their investigation of Cai's allegations against Doe, the matter took an unusual turn: Doe filed a complaint with each institution accusing Cai of stalking *him* in 2018. (Dkt. 13 at p. 47; Dkt. 13-1 at pp. 254, 260). Doe accused Cai of sabotaging his experiments, colluding with UTH and MDA officials, filing a false complaint, and making false statements about him. (Dkt. 13-1 at p. 260).

Obeng, who evaluated Doe's complaint for UTH, declined to initiate an investigation into Doe's allegations after concluding that Doe had "not allege[d] any conduct by Ms. Cai that would support an allegation of stalking[.]" (Dkt. 13-1 at p. 257). Obeng also declined Doe's request that she recuse herself from the evaluation of his complaint. (Dkt. 13-1 at p. 254). Campbell, the Associate Vice President of Human Resources at MDA, evaluated Doe's complaint for MDA. (Dkt. 13-1 at p. 260). After retaining outside counsel to conduct an investigation, Campbell concluded that Doe's allegations against Cai were unsubstantiated. (Dkt. 13-1 at p. 260). Campbell also concluded that Doe's "allegations against Ms. Cai of research sabotage and collusion with [UTH] and [MDA] officials constitute[d] retaliation against Ms. Cai in violation of [MDA's] Non-Retaliation Policy." (Dkt. 13-1 at p. 260).

*—Doe's current status at UTH and MDA*

Since Obeng found evidence supporting some of Cai's allegations against Doe, UTH's Office of Admissions and Student Affairs referred Doe to UTH's Student Evaluations and Promotions Committee ("SEPC"). (Dkt. 13-1 at p. 239). The SEPC

examined whether Doe's behavior toward Cai constituted a "breach of professional conduct" and whether Doe had unduly failed to sit for a required professional licensing examination while on leave from his medical studies at UTH. (Dkt. 13-1 at pp. 239, 242). To aid in its determination, the SEPC required Doe to be evaluated by a psychiatrist. (Dkt. 13-1 at pp. 243–44). In March of 2020, the SEPC decided to allow Doe to resume his medical education at UTH, as long as he continued seeing the psychiatrist weekly for a year and took the required licensing examination before July of 2020. (Dkt. 13-1 at p. 247).

Doe was also allowed to return from his paid leave and begin working again at MDA, but his return to the DePinho lab was made subject to a management plan because Reed found sufficient evidence to substantiate a violation of Principle Nine of MDA's Code of Conduct. (Dkt. 13-1 at pp. 200–01). As discussed above, the conduct found by Reed to be potentially violative of Principle Nine revolved around Cai's allegations that Doe continued to contact her after she told him to leave her alone. (Dkt. 13-1 at p. 193). In line with Reed's findings, the management plan barred Doe from using research areas and equipment when Cai was using them. (Dkt. 13-1 at p. 200). The management plan also stated that Doe was "not permitted to be in the workplace during off work hours when Ms. Cai [wa]s present[,]" with off-work hours defined as "hours outside of the typical workday, which is 8am to 6pm Monday through Friday[.]" (Dkt. 13-1 at p. 200). The management plan further prohibited Doe from working in the lab under any circumstances between the hours of 7:00 p.m. and midnight on Mondays, Wednesdays, and Fridays; he was allowed to work in the lab during those hours on Tuesdays, Thursdays, and Saturdays. (Dkt. 13-1 at p. 200).

Doe refused to agree to the management plan and, as a result, was not allowed to return to the DePinho lab. (Dkt. 13 at p. 55; Dkt. 13-1 at p. 287). Doe ended up working in a different laboratory engaged in different research. (Dkt. 13-1 at p. 287).

*—Doe's EEOC charge*

Doe filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 3, 2021, alleging that MDA discriminated against him based on sex, national origin, and perceived disability. (Dkt. 13-1 at p. 281). Doe stated in his charge that he was first notified that he would not be allowed to return to the DePinho lab on August 10, 2020. (Dkt. 13-1 at p. 287). Doe received a right-to-sue letter from the EEOC on September 24, 2021. (Dkt. 13-1 at p. 289).

*—This lawsuit*

Doe filed this lawsuit in Texas state court on February 28, 2021. (Dkt. 1-2 at p. 1). The defendants removed this case to this Court, and Doe has filed two amended complaints and a more definite statement. (Dkt. 9; Dkt. 13; Dkt. 19). The defendants have moved to dismiss Doe's claims under Federal Rule of Civil Procedure 12(b)(6).

## RULE 12(b)(6)

Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests a pleading's compliance with this requirement and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A complaint can be dismissed under Rule

12(b)(6) if its well-pleaded factual allegations, when taken as true and viewed in the light most favorable to the plaintiff, do not state a claim that is plausible on its face. *Amacker v. Renaissance Asset Mgmt., LLC*, 657 F.3d 252, 254 (5th Cir. 2011); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). As the Fifth Circuit has further clarified:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This includes the basic requirement that the facts plausibly establish each required element for each legal claim. However, a complaint is insufficient if it offers only labels and conclusions, or a formulaic recitation of the elements of a cause of action.
> *Coleman v. Sweetin*, 745 F.3d 756, 763–64 (5th Cir. 2014) (quotation marks and citations omitted).

When considering a motion to dismiss under Rule 12(b)(6), the Court's review is limited to the complaint; any documents attached to the complaint; any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint; and matters subject to judicial notice under Federal Rule of Evidence 201. *Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022); *George v. SI Group, Inc.*, 36 F.4th 611, 619 (5th Cir. 2022). If the plaintiff's allegations are contradicted by facts disclosed by a document attached to the complaint or by facts disclosed by a document attached to the motion to dismiss that is central to the claim and referenced by the complaint, then the plaintiff's contradicted allegations are not accepted as true. *Carter v. Target Corp.*, 541 Fed. App'x 413, 417 (5th Cir. 2013) (refusing to accept as true factual allegations that were contradicted by the plaintiff's EEOC charging documents, which the defendant had attached to its motion to dismiss) ("These issues are central to Carter's pleadings, and her

failure to include them does not allow her complaint to bypass Target's motion to dismiss unexamined. We will review Target's motion to dismiss with the benefit of Carter's EEOC and LCHR charges. . . . Because Charge 23 does not exist, we need not accept as true Carter's assertions that she filed and received her right-to-sue notice for Charge 23.") (citation omitted).

Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).

## DOE'S CLAIMS AGAINST THE INSTITUTIONAL DEFENDANTS

Doe's live pleading brings the following causes of action against MDA: (1) employment discrimination (based on sex, national origin, and perceived disability) and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Texas Commission on Human Rights Act ("TCHRA"); (2) violation of Title IX of the Education Amendments of 1972 ("Title IX"); and (3) violation of the Takings Clause of Article I, § 17 of the Texas Constitution ("the Takings Clause"). (Dkt. 19 at pp. 1–2, 6). Doe's live pleading brings the following causes of action against UTH: (1) violation of Title IX; and (2) violation of the Takings Clause. (Dkt. 19 at p. 6).

Though this case presents a close call, the Court concludes that Doe has pled sufficient facts to proceed on his claims against MDA and UTH, with the exception that some of Doe's claims under Title VII and the TCHRA, as explained below, are time-barred. As to the claims that are moving forward, MDA and UTH may reurge their arguments for dismissal in a motion for summary judgment.

—*Doe failed to exhaust his administrative remedies on many of his claims against MDA.*

MDA contends that Doe failed to exhaust his administrative remedies regarding any claim brought against it under Title VII that accrued before August 7, 2020 and any claim brought against it under the TCHRA that accrued before December 5, 2020.[4] (Dkt. 38 at p. 11). The Court agrees.

In Texas, which has a state fair employment agency (the Texas Workforce Commission—"TWC") that has a work-sharing agreement with the EEOC, a Title VII plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory act. *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843, 1846 (2019). "The time period generally begins to run when the employee receives notice of the allegedly discriminatory decision, not when the employment actually ceases." *Conaway v. Control Data Corp.*, 955 F.2d 358, 362 (5th Cir. 1992). Failure to file a charge with the EEOC and exhaust administrative remedies before filing a Title VII action will result in dismissal. *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788–89 (5th Cir. 1996). The TCHRA also requires a plaintiff to exhaust administrative remedies, and the relevant time period is shorter: 180 days rather than 300. Tex. Lab. Code § 21.202(a); *see also Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 552–53 (5th Cir. 2020). Filing a charge with the EEOC satisfies

---

[4] MDA also argues that Doe's TCHRA claims against it are barred, irrespective of when they accrued, by sovereign immunity. (Dkt. 38 at p. 10). On this point, the Court disagrees with MDA. MDA "do[es] not enjoy 'immunity from liability' because the TCHRA waived it. And [MDA] no longer enjoy[s] 'immunity from suit' because [MDA] waived it by removal." *Zeng v. Texas Tech University Health Science Center at El Paso*, 836 Fed. App'x 203, 207–08 (5th Cir. 2020) (citation omitted).

the complaint-filing requirement for the TCHRA, but the 180-day time limit under the TCHRA still applies. *Griffin v. City of Dallas*, 26 F.3d 610, 612–13 (5th Cir. 1994); *see also Adams v. DaimlerChrysler Services NA LLC*, 252 Fed. App'x 681, 683 (5th Cir. 2007) (affirming district court's dismissal of TCHRA claims as time-barred when those claims accrued more than 180 days before the plaintiff filed her EEOC charge).

If the plaintiff's failure to exhaust administrative remedies is established by the pleadings and the other properly considered documents, then dismissal under Rule 12(b)(6) is appropriate. *Carter*, 541 Fed. App'x at 417; *see also Clark v. Amoco Production Co.*, 794 F.2d 967, 970 (5th Cir. 1986) ("[A] claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings."). Doe has attached his EEOC charge to his live complaint; he filed that charge on June 3, 2021. (Dkt. 13-1 at p. 281). Accordingly, Doe has failed to exhaust his administrative remedies regarding any claim brought against MDA under Title VII that accrued before August 7, 2020 (300 days before June 3, 2021) and any claim brought against MDA under the TCHRA that accrued before December 5, 2020 (180 days before June 3, 2021). Those claims must be dismissed as time-barred.

 *—The continuing violation doctrine does not apply.*

Doe contends that the continuing violation doctrine saves his claims that accrued outside of the Title VII and TCHRA time limits. (Dkt. 32 at pp. 10–12). The Court disagrees.

Under the continuing violation doctrine, "a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period, if the

plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004). However, when discussing the continuing violation doctrine in the context of employment discrimination law, the Supreme Court has drawn a "direct contrast" between, on the one hand, "discrete acts" that are "easy to identify" such as "termination, failure to promote, denial of transfer, or refusal to hire" and, on the other hand, "[h]ostile environment claims" that "involve[] repeated conduct" and are "based on the cumulative effect of individual acts" that "may not be actionable on [their] own[,]" such as "racial jokes, . . . racially derogatory acts, . . . negative comments regarding the capacity of [people of a certain race] to be supervisors, and [the use of] racial epithets." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15, 120 (2002). Discrete acts do not implicate the continuing violation doctrine; they "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id*. at 113. Moreover, "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Id*. at 112. The Texas Supreme Court interprets the TCHRA in line with the Supreme Court's interpretation of Title VII in *Morgan*. *See Prairie View A&M University v. Chatha*, 381 S.W.3d 500, 505–06 & n.8 (Tex. 2012).

Hostile work environment claims that implicate the continuing violation doctrine involve, as Justice O'Connor aptly phrased it, "a general atmosphere of discrimination not completely reducible to particular discriminatory acts[.]" *Morgan*, 536 U.S. at 124 (O'Connor, J., concurring and dissenting); *see also Igwe v. Menil Foundation Inc.*, No. 4:17-CV-3689, 2020 WL 7024374, at *3–4 (S.D. Tex. Nov. 30, 2020) ("[A] continuing

violation is unlawful only by reference to a pattern of behavior. . . . [M]inor insults and the imposition of workplace inconveniences are only actionable when they occur repeatedly over a prolonged period of time."). Such a claim is not pled here. Doe complains of particular, discrete allegedly discriminatory acts, such as MDA's placing him on paid investigative leave and refusing to allow him to return to the DePinho lab without submitting to a management plan. (Dkt. 32 at p. 11). Moreover, Doe only points to one allegedly discriminatory act that took place after August 7, 2020: the August 10, 2020 notification that he would not be allowed to return to the DePinho lab, which Doe characterizes as a "transfer or reassignment [that was] the equivalent of a demotion[.]" (Dkt. 32 at p. 9). This alleged demotion was a single, easily identifiable act that took place on an ascertainable date, and as such it was a discrete act that does not implicate the continuing violation doctrine. *Morgan*, 536 U.S. at 110 ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'"); *see also, e.g., Baker v. FedEx Ground Package System Inc.*, 278 Fed. App'x 322, 326 (5th Cir. 2008) (holding that a transfer to a different shift was a discrete act under *Morgan*); *Miller v. New Hampshire Department of Corrections*, 296 F.3d 18, 22 (1st Cir. 2002) (holding that a transfer to a different unit was a discrete act under *Morgan*).  Accordingly, any claim brought against MDA under Title VII that accrued before August 7, 2020 (300 days before June 3, 2021) and any claim brought against MDA under the TCHRA that accrued before December 5, 2020 (180 days before June 3, 2021) must be dismissed as time-barred. *Morgan*, 536 U.S. at 112 ("[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period.").

The Institutional Defendants' motion to dismiss is granted as to any claim brought against MDA under Title VII that accrued before August 7, 2020 (300 days before June 3, 2021) and any claim brought against MDA under the TCHRA that accrued before December 5, 2020 (180 days before June 3, 2021). The motion is otherwise denied without prejudice to being reasserted as a motion for summary judgment.

## DOE'S CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

Doe's live pleading brings several claims against each of the Individual Defendants. Those claims arise under the Texas and United States Constitutions and essentially fall into three groups: (1) due process violations; (2) "false arrest, and/or . . . malicious criminal prosecution[;]" and (3) equal protection violations. (Dkt. 19 at pp. 2–5). Doe also alleges that the Individual Defendants conspired to violate his rights under the United States Constitution. (Dkt. 19 at pp. 7–8). Doe seeks "injunctive, declaratory and equitable relief" for the alleged Constitutional violations. (Dkt. 19 at pp. 2–5, 7–8). He seeks money damages under 42 U.S.C. § 1983 ("Section 1983") for violations of the United States Constitution but "is not seeking any monetary relief under the Texas Constitution." (Dkt. 19 at pp. 2–5, 7–8). The Individual Defendants pled the defense of qualified immunity in their state-court answer and have raised it in their motion to dismiss. (Dkt. 1-5 at p. 3; Dkt. 31 at p. 15).

The Court concludes that the Individual Defendants are entitled to qualified immunity.[5] All claims for monetary damages brought under Section 1983 against the

---

[5] The Individual Defendants are not, however, entitled to Eleventh Amendment immunity on the claims against them in their official capacities; Eleventh Amendment immunity was waived when

Individual Defendants in their individual capacities, including the claim that the Individual Defendants conspired to violate Doe's rights under the United States Constitution, are dismissed. As to the other claims against them, the Individual Defendants may reurge their arguments for dismissal in a motion for summary judgment. *See Singleton v. Cannizzaro*, 956 F.3d 773, 778 n.3 (5th Cir. 2020) (noting that qualified immunity "protect[s] only *individuals* from claims for *damages* [and does] not bar official-capacity claims or claims for injunctive relief") (emphasis in *Singleton*).

—*Qualified immunity*

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). When a defendant asserts a qualified immunity defense in a motion to dismiss, the district court must "carefully scrutinize the complaint . . . because qualified immunity means immunity from having to stand trial, not simply immunity from monetary liability." *Kelson v. Clark*, 1 F.4th 411, 416 (5th Cir. 2021) (quotation marks omitted).

---

Defendants removed this case to federal court. *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 255–56 (5th Cir. 2005) ("Because Texas has waived its immunity from suit in federal court in this case it is not necessary for the plaintiffs to invoke the *Ex parte Young* doctrine in order to prosecute their action against the defendants."). At this time, the Individual Defendants are also not entitled to official immunity under Texas law, which they did not specifically plead in their state-court answers. "[O]fficial immunity is an affirmative defense that must be pled and proved by the party asserting it." *Brown & Gay Engineering, Inc. v. Olivares*, 461 S.W.3d 117, 128 (Tex. 2015). The burden is on the defendant to establish all elements of the defense, and it "is somewhat less likely to be resolved at the summary judgment stage than is the federal [qualified immunity] test." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653–57 (Tex. 1994).

The burden is on the plaintiff to demonstrate the inapplicability of the qualified immunity defense. *Id.* A plaintiff seeking to overcome qualified immunity "must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Id.* The plaintiff "must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Morgan*, 659 F.3d at 371 (quotation marks omitted). Courts have discretion to decide which prong of the qualified immunity analysis to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

When attempting to show that a right was clearly established at the time of the challenged conduct, "[i]t is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality." *Vann v. City of Southaven, Mississippi*, 884 F.3d 307, 310 (5th Cir. 2018) (quotation marks omitted) ("Plaintiff . . . cited nary a pre-existing or precedential case. That alone dooms his case here."). The inquiry "must be undertaken in light of the specific context of the particular case, not as a broad general proposition." *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (brackets and ellipsis omitted). "Although qualified immunity does not require a case in point, existing precedent must have placed the statutory or constitutional question beyond debate[,]" such that "every reasonable official would understand that what she is doing violates that right." *Id*. (brackets and quotation marks omitted).

*—Doe has not met his burden to demonstrate the inapplicability of the qualified immunity defense.*

The Individual Defendants are entitled to qualified immunity. Doe has not shown that it is "beyond debate" that the Individual Defendants violated his rights under the United States Constitution.

i.    Doe's arrest

To prevail on a Section 1983 false arrest/false imprisonment claim, Doe must show that there was no probable cause to arrest him. *Haggerty v. Texas Southern University*, 391 F.3d 653, 655 (5th Cir. 2004). The defendant in a Section 1983 false arrest/false imprisonment claim "is entitled to qualified immunity if a reasonable officer in [the defendant's] position could have believed that, in light of the totality of the facts and circumstances of which [the defendant] was aware, there was a fair probability that [the plaintiff] had committed or was committing an offense." *Id*. "Even law enforcement officials who reasonably but *mistakenly* conclude that probable cause is present are entitled to immunity." *Id*. (emphasis in *Haggerty*). Under the electronic-communications-harassment statute, "[a] person commits an offense if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person . . . sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another[.]" Tex. Penal Code § 42.07(a)(7).

Doe contends that his arrest and prosecution for violating the electronic-communications-harassment statute lacked "probable cause, credible evidence, or legal justification[.]" (Dkt. 37 at p. 32). However, even when one accounts for the possibility of

inexact translation of the emails between Doe and Cai, there was ample reason to believe that Doe had violated the electronic-communications-harassment statute. Doe's own attachments to his complaint show that he repeatedly emailed Cai after she told him to leave her alone. (Dkt. 13-1 at pp. 179–81). After Cai told him in emails that his "harassment" was "caus[ing] fear to [her] and negatively impact[ing her,]" Doe continued to email her, at one point writing the following passage:

> If you have to hate me, then let it be. In order to help you hate me more, I am willing to make sacrifices and do a lot of things that make you hate and dislike me.
> Dkt. 13-1 at pp. 179–81.

Moreover, although the criminal charge against Doe was dismissed, it was dismissed on the basis of a facial Constitutional challenge to the statute, not on the basis that Doe did not engage in the criminalized conduct. The state trial judge expressly "did not consider the factual merits" of the case against Doe. (Dkt. 13-1 at p. 204). And even now, the dismissal is not final. *See Ex parte Chen*, 2022 WL 17171098; *see also* United States Supreme Court docket number 22-497. Doe points to no case in which the qualified immunity defense was defeated under such circumstances.

    ii.   <u>Due process</u>

Similarly, Doe cites no analogous due process cases. That failure is fatal to his attempt to overcome qualified immunity, as "the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 86 (1978) (brackets omitted).

Procedural due process in the context of college or graduate school discipline requires only an "informal give-and-take" between the student and the administrative body dismissing him that would give the student "the opportunity to characterize his conduct and put it in what he deems the proper context." *Goss v. Lopez*, 419 U.S. 565, 584 (1975). Decisions based on academic rather than disciplinary grounds are subject to even "less stringent procedural requirements"—the decisionmaker simply must "fully inform [the student] of the faculty's dissatisfaction with her [academic] progress" and make a "careful and deliberate" decision to dismiss the student. *Horowitz*, 435 U.S. at 84–86.

As for the employment context, "[i]t is well-settled that Texas is an at-will employment state and that, absent an express agreement to the contrary, employment may be terminated at any time by either party with or without cause." *McDonald v. City of Corinth, Texas*, 102 F.3d 152, 156 (5th Cir. 1996). An at-will employee is not entitled to procedural due process in connection with his termination. *Id.* at 155. To state a due process claim, then, "an employee must show that the at-will presumption has been altered." *Zeng v. Texas Tech University Health Science Center at El Paso*, 836 Fed. App'x 203, 211 (5th Cir. 2020). There are two ways in which the at-will relationship may be altered: (1) by contract; and (2) by rules or policies that "specifically and expressly curtail[] the employer's right to terminate the employee." *Muncy v. City of Dallas, Texas*, 335 F.3d 394, 398 (5th Cir. 2003); *McDonald*, 102 F.3d at 156. "Generally, courts find that statements about working conditions, grievance procedures or termination rights are insufficient to change an employee's at-will status." *McDonald*, 102 F.3d at 156; *see also Glagola v. North Texas Municipal Water District*, 705 F. Supp. 1220, 1223 (E.D. Tex. 1989)

(collecting cases) ("The cases discussed above exhibit a general rule in Texas that employee handbooks or personnel manuals unilaterally issued by an employer, standing alone, may not expressly or impliedly limit an employer's ability to terminate an employee at will."). !

Doe was not suspended from UTH, much less expelled, as a result of the investigations. He was not fired from MDA, and his investigative leave from MDA was paid. Although he alleges that he was forced to transfer from the DePinho lab, the transfer resulted from his refusal to submit to a management plan designed to separate him from Cai while the two were working at the DePinho lab. On their own, the emails quoted at length above provided a reasonable basis on which MDA officials could have concluded that separating Doe from Cai was advisable. Doe does not specifically describe or attach any express agreement by which his at-will employment status was changed such that the actions taken against him by MDA (or by any individual defendant) effectuated the deprivation of a protected property interest. Moreover, it is hard to square Doe's characterization of the joint MDA/UTH investigation as a "kangaroo court" with the fact that many of the investigators' findings were favorable to him, in the sense that the investigators deemed Cai's allegations of sexual harassment unsubstantiated. Again, Doe points to no case in which the qualified immunity defense was defeated under sufficiently similar circumstances.

iii.   Equal protection

Doe has also failed to overcome qualified immunity on his claims under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

To establish a claim under the Equal Protection Clause, Doe "must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Priester v. Lowndes County*, 354 F.3d 414, 424 (5th Cir. 2004). "Being similarly situated is key. Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws." *Hines v. Quillivan*, 982 F.3d 266, 272–73 (5th Cir. 2020) (quotation marks omitted). To determine whether persons or groups are similarly situated, the Court must "inquire as to whether they are in all relevant respects alike." *Texas Entertainment Association, Inc. v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021) (quotation marks omitted).

The only comparator to whom Doe points to support his equal protection claim is Cai. He contends that "he received different treatment from that received by Cai, a similarly-situated female co-worker and co-student, and that the unequal treatment stemmed from discriminatory intent." (Dkt. 37 at p. 20). Doe alleges that his rights under the Equal Protection Clause were violated because his complaint against Cai did not trigger a "legitimate and meaningful investigation . . . against Cai for bringing false allegations[.]" (Dkt. 13 at p. 97).

Doe does not plead any facts showing that Cai, or any other possible comparator, was treated differently from Doe despite being in all relevant respects similarly situated to Doe. Doe does not highlight relevant points of comparison that make Cai a suitable comparator on which an equal protection claim can be based. Cai and Doe made very

different factual allegations against each other in their complaints; Doe's complaint was made over a year later than Cai's; and Cai's claim that Doe refused to leave her alone when she asked him to was strongly corroborated by Doe's own emails to her. In any event, as with his other claims under Section 1983, Doe points to no case in which the qualified immunity defense was defeated under sufficiently similar circumstances.

      iv.   <u>Conspiracy</u>

Doe claims that the Individual Defendants conspired to violate his rights under the United States Constitution. (Dkt. 13 at p. 109). This claim fails because Doe has failed to defeat the Individual Defendants' qualified immunity defenses.

"To state a claim for conspiracy under § 1983, a plaintiff must allege the existence of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation." *Whisenant v. City of Haltom City*, 106 Fed. App'x 915, 917 (5th Cir. 2004). If the members of the alleged conspiracy are entitled to qualified immunity, then "the conspiracy claim is not actionable." *Hale v. Townley*, 45 F.3d 914, 921 (5th Cir. 1995). All of the Individual Defendants are entitled to qualified immunity, so the Court will dismiss the Section 1983 conspiracy claim against them.

**CONCLUSION**

The Institutional Defendants' motion to dismiss (Dkt. 30) is **GRANTED IN PART AND DENIED IN PART**. The Institutional Defendants' motion to dismiss is granted as to any claim brought against MDA under Title VII that accrued before August 7, 2020 (300 days before June 3, 2021) and any claim brought against MDA under the TCHRA that

accrued before December 5, 2020 (180 days before June 3, 2021). The motion is otherwise denied without prejudice to being reasserted as a motion for summary judgment.

The Individual Defendants' motion (Dkt. 31) is also **GRANTED IN PART AND DENIED IN PART**. The Court concludes that the Individual Defendants are entitled to qualified immunity. All claims for monetary damages brought under 42 U.S.C. § 1983 against the Individual Defendants in their individual capacities, including the claim that the Individual Defendants conspired to violate Doe's rights under the United States Constitution, are dismissed. As to the other claims against them, the Individual Defendants may reurge their arguments for dismissal in a motion for summary judgment.

SIGNED at Houston, Texas, on _____January 30_____, 2023.


_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE